2023 IL App (2d) 220204-U
No. 2-22-0204
Order filed March 2, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2430 |
| RENE CUANETL, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to convict defendant of aggravated criminal sexual abuse for kissing the victim on the mouth for defendant's sexual gratification. Even if, as defendant claimed, the victim's trial testimony conflicted with her unequivocal out-of-court statement—that defendant kissed her on the mouth while sexually abusing her in other ways—the jury was entitled to rely on the victim's statement, which she gave less than two weeks after the incident.

¶ 2    After a jury trial, defendant, Rene Cuanetl, was convicted of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). The trial court merged one conviction of aggravated criminal sexual abuse into one conviction of predatory criminal sexual assault of a

child and sentenced defendant to two consecutive seven-year prison terms for predatory criminal sexual assault of a child, to run consecutively to a three-year term for aggravated criminal sexual abuse. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of aggravated criminal sexual abuse. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State indicted defendant on four counts. Counts I and II charged predatory criminal sexual assault of a child and counts III and IV charged aggravated criminal sexual abuse. All four counts alleged offenses occurring on October 1, 2018, when defendant was over 17 and the victim, N.G., was under 13. Count I alleged that defendant committed an act of sexual penetration with N.G. by placing his mouth on her sex organ. Count II alleged that defendant committed an act of contact between his sex organ and N.G.'s sex organ for his sexual gratification. Count III alleged that defendant committed an act of sexual conduct with N.G. by touching her sex organ with his sex organ for his sexual gratification. Count IV alleged that defendant committed an act of sexual conduct with N.G. by touching her mouth for his sexual gratification.

¶ 5      The trial court held a hearing on the State's motion under section 115-10(b)(1) of the Code of Criminal Procedure (725 ILCS 5/115-10(b)(1) (West 2020)) to introduce out-of-court statements that N.G. allegedly made to (1) her father, Angel G., (2) Susan Salinas-Ramirez, a child forensic interviewer with the Kane County Child Advocacy Center (KCCAC), and (3) a schoolmate and close friend. Only the first two testified at trial. The court also listened to and watched the video recording of Salinas-Ramirez's interview of N.G. and read the interview transcript (both of which were admitted without objection at the hearing).

¶ 6      In brief, Angel G. testified that, in the fall of 2018, during a heated conversation, N.G. told him that defendant had entered her bedroom by force, fondled her "[i]n her parts[,]" and penetrated

her. After the conversation, Angel took N.G. to the Aurora police station. He never told N.G. what to say to anyone. Salinas-Ramirez testified that, on October 11, 2018, she interviewed N.G. Before questioning N.G., Salinas-Ramirez advised her to tell the truth, to admit when she did not know something, and to correct Salinas-Ramirez if she made a mistake. The interview was conducted in English and Salinas-Ramirez used nonleading questions. N.G. used appropriate language for a person her age. The trial court held that all of the statements at issue were admissible because there were sufficient safeguards of reliability—namely, there was no motive for N.G. to lie and no evidence that anyone had told her what to say.

¶ 7     We turn to the trial evidence. Angel G. testified as follows. He resided in Aurora with his wife Patricia, their eldest daughter, N.G., their son G.G., and their younger daughters, D.G. and P.G. Defendant was Patricia's brother. Around October 2018, Angel and his family moved from an apartment complex to a two-story apartment in a converted home. Defendant and his brother Leo were already living there. Angel, Patricia, G.G., and D.G. slept downstairs. (P.G. had not yet been born.) N.G. occupied one of the two upstairs bedrooms. Defendant and Leo occupied the other bedroom, across the hall.

¶ 8     Angel testified that, when his family moved in, defendant was planning to move out soon to join his wife and children in New York. One evening shortly before the planned move, Angel and defendant sat in the kitchen, drinking beer. Defendant became intoxicated, which was not unusual for him. Angel stayed up with defendant but went to bed no later than 1 a.m. Angel did not see N.G. that night but knew she was in her room.

¶ 9     Angel testified that, about a week after defendant moved out, he and Patricia spoke with N.G. N.G. was upset. Angel asked her why; she responded that defendant had entered her bedroom and abused her. Specifically, she said that, while she lay in bed, defendant sat on the bed and asked

her questions about sex, such as whether she had ever had intercourse. He also touched her body and took off her clothes. He then removed his clothes and got on top of her.

¶ 10   Angel testified that he called defendant and asked about the incident. Defendant told Angel that he had entered N.G.'s bedroom to get his beer, then added that he entered the bedroom to retrieve his phone. Angel later reported N.G.'s allegations to the police. As a result, officers came to his home. He gave them a bag containing the underwear that N.G. said she had worn when defendant entered his room and some sheets that she said had been on her bed at the time.

¶ 11   The parties stipulated that Aurora police officer Jacob Goehring would testify that, on October 8, 2018, while he was working the front desk at the police station, Angel and N.G. entered. Angel spoke to Goehring outside of N.G.'s presence. Based on the conversation, Goehring contacted the Department of Children and Family Services, filled out and faxed a referral form to the KCCAC, and dispatched officers to Angel's apartment.

¶ 12   N.G. testified on direct examination as follows. She was born January 19, 2006. At the time of trial in March 2022, G.G. was 14 years old, D.G. was 3, and P.G. was 2. Defendant was her uncle. In October 2018 "or a little before," N.G. and her family moved to the two-story apartment, where defendant and Leo already resided. N.G. had a second-floor bedroom, defendant and Leo had a bedroom across the hall, and the rest of N.G.'s family slept downstairs. After her family moved in, defendant lived there for less than a month.

¶ 13   N.G. testified that, on September 30, 2018, her family, defendant, and Leo were home. She went to bed at about 11 p.m. or midnight. Shortly afterward, she woke up when defendant entered the room. He stood in the doorway and said that he wanted to talk. He asked permission to lie down on her bed, and N.G. allowed him to do so. Defendant then began asking N.G. whether she was intimate with a boy and had ever had sex. He started to feel her stomach and waist over her

clothes; she told him to stop and leave. Instead, defendant slowly started to take off her pants and "kiss[ed] [her] on *** [her] face" He then got on top of her while trying to take off her pants. Eventually, he removed her pants and underwear. Next, he started licking her vagina. He removed his own clothing and tried to insert his penis into her vagina, but could not. Defendant then made N.G. "suck his dick." N.G. was still lying on her back.

¶ 14    The direct examination continued:

> "Q. Okay. Did he—did he kiss you anywhere?
>
> A. As far as I know, no, only just my private part.
>
> Q. Do you remember if he kissed you on your mouth?
>
> A. No."

¶ 15    N.G. testified that, when defendant left the room, she was crying. She could not sleep. As it was now Monday, she went to school later that morning.

¶ 16    N.G. testified that, later that week, she woke up to find defendant "already on top of [her] and trying to kiss [her]." She had tried to block the door with her bed, but he had forced his way in. She told him to leave. He refused, and "then he kept on going and going with the same stuff, trying to get in." He offered her $20. She told him that if he did not leave, she would scream. Defendant left.

¶ 17    N.G. testified that, later that week, defendant moved out. Patricia asked N.G. to say goodbye to defendant, but she refused because of what he had done to her.

¶ 18    N.G. testified on cross-examination that, when she moved into the new apartment, she was aware that defendant and Leo planned to move out soon. She spent less than a month sharing the apartment with defendant. A few days after defendant moved out, Leo also moved out.

¶ 19    N.G. testified that the first time that defendant entered her room was about 2:30 a.m. on Monday. The second time was the next night, when she woke up to find defendant on top of her. She reiterated that he offered her $20 and she refused it.

¶ 20    Patricia G. testified as follows. Shortly before October 2018, her family moved into the two-story apartment, where defendant and Leo were already residing. About a week after her family moved in, defendant moved out. A few days later, Leo moved out. Angel was at work when defendant moved out, but Patricia and N.G. were present. Defendant said goodbye to N.G., but she became upset and moved away from him. Patricia asked her why she was mad; she said it was because of what he had done to her. The next day, N.G. told Patricia what defendant had done to her.

¶ 21    Christopher Grandchamp, an Aurora police officer, testified that, on October 8, 2018, he was dispatched to N.G.'s apartment, where Angel gave the police consent to search. Shawn McCleary, another Aurora police officer, testified that, on that same day, Angel gave him a bag containing some of N.G.'s clothing and two bed sheets. In N.G.'s bedroom, McCleary tested the bed, pillows, and blankets with ultraviolet light for semen stains but found none. He took the bagged items to the police station but did not run ultraviolet-light tests on them.

¶ 22    Shannon Krueger, a pediatric nurse practitioner, testified that, on November 13, 2018, she interviewed and examined N.G. at the KCCAC. She also received a history from N.G. N.G. did not undergo a full physical examination, as she was embarrassed that she had several partially healed scars from cutting herself deliberately sometime earlier. N.G. did not report any pain, bleeding, rash, or discharge in her genital area.

¶ 23    Salinas-Ramirez, a child forensic interviewer with the KCCAC, testified that, on October 11, 2018, she interviewed N.G. there. Using anatomical drawings of a woman and a man, Salinas-

Ramirez asked N.G. where defendant had touched her and to point out that area on the drawing of the woman. N.G. said that he had touched her on her " 'thing,' " and she pointed to the vaginal area on the drawing. Salinas-Ramirez asked whether she had a name for this area; she responded, " 'vagina.' " Salinas-Ramirez then asked N.G. what defendant had used to touch her vagina, and N.G. pointed to the penis in the drawing of the man and called it the " 'dick.' "

¶ 24    Salinas-Ramirez identified a video recording and typed transcript of her interview with N.G. Both were admitted into evidence and published to the jury. In the interview, N.G. described both times that defendant had entered her bedroom. She stated that the first encounter occurred late Sunday, September 30, 2018, into Monday, October 1, 2018; the second occurred late Tuesday, October 2, 2018.

¶ 25    N.G. told Salinas-Ramirez that, during the first encounter, defendant put his hand on her stomach over her clothes, then took off her shorts and underwear and removed his clothing. He got on top of her and attempted intercourse, but "he couldn't cause his was like small." He also licked her vagina. Finally, he offered her $20; she told him to leave, or she would scream. He left. Later that morning, N.G. went to school.

¶ 26    N.G. told Salinas-Ramirez that, just before the second encounter on Tuesday, defendant asked her to open the door. She refused, but he forced his way in. He was wearing only his underwear. He approached her, but she told him to leave. She was about to hit him when he said that he would leave. However, he then tried to kiss her. She told him that, if he did anything, she would scream. At this point, the interview continued:

"Susan: Okay so when he kissed you umm where did he kiss you?

[N.G.]: No he was about to kiss me but

Susan: He was about to kiss you

[N.G.]: *But the first time at the first on the Sunday he did kiss me in the mouth*

Susan: He did kiss you on the mouth okay

[N.G.]: And then back to the thing umm he tried kissing me I was like if you do kiss me I swear this is gonna happen and all I tried to scare him away he did went [*sic*] away ***." (Emphasis added.)

¶ 27    The State rested. Defendant moved for a directed verdict, which the trial court denied. The defense presented no evidence. The jury found defendant guilty on all four charges. The trial court merged count III into count II and sentenced defendant to consecutive prison terms of seven years for count I, seven years for count II, and three years for count IV. Defendant timely appealed.

¶ 28                                              II. ANALYSIS

¶ 29    On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt on count IV, which charged that defendant committed aggravated criminal sexual abuse by touching N.G.'s mouth for his sexual gratification. (Defendant does not challenge either conviction of predatory criminal sexual assault of a child.)  The State clarified during the trial that it was alleging that defendant kissed N.G. on the mouth during their first encounter. Defendant argues that the State's theory was supported solely by N.G.'s unsworn statement to Salinas-Ramirez contradicting her trial testimony that she could not recall defendant having kissed her anywhere other than her private parts and could not remember whether he kissed her on the mouth. Defendant concludes that, because N.G.'s statement to Salinas-Ramirez was uncorroborated *and* undermined by N.G. herself, it was insufficient to prove his guilt. For the reasons that follow, we disagree.

¶ 30    When considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979); *People v. Baskerville*, 2012 IL 111056, ¶ 31. All reasonable inferences from the evidence must be resolved in favor of the prosecution. *Id.* Further, we may not substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 31 Based on the foregoing principles, the resolution of this appeal is straightforward. In her interview, which was properly admitted as substantive evidence, N.G. stated directly that defendant kissed her on the mouth during their first encounter. The jury exercised its prerogative in crediting this statement and drawing the reasonable inference that defendant engaged in the act for his sexual gratification.

¶ 32 Defendant's attacks on the evidence are unavailing. He is correct that N.G.'s statement that defendant kissed her on the mouth during the first incident was not directly corroborated. However, long ago, our supreme court abrogated the rule that "the testimony of a victim of a sex crime is deemed insufficient" on appeal unless it is "clear and convincing or substantially corroborated." *People v. Schott*, 145 Ill. 2d 188, 202 (1991). Nonetheless, N.G. did testify that defendant "kiss[ed] [her] on *** [her] face" during the first incident. She also testified that, on the second night, she woke up when defendant was "already on top of [her] and trying to kiss [her]." She continued, "[H]e kept on going and going with the same stuff, trying to get in." N.G.'s testimony that defendant tried to kiss her during the second incident supports the reasonable inference that defendant did actually kiss N.G. on the mouth during the first incident while, as the State notes, "he engaged in his full range of sexual assaults against her."

¶ 33 Defendant also contends that N.G.'s statement was incredible because it was inconsistent with her testimony at trial. There are two flaws in this contention. First, there was no flat inconsistency. In her statement, N.G. clearly asserted that defendant kissed her on the mouth. In

her testimony, more than three years after the incident and her statement, she initially testified that defendant "kiss[ed] [her] on *** [her] face," but later stated that (1) "as far as [she] kn[ew]," defendant did not kiss her on the mouth and (2) she did not remember whether he kissed her on the mouth. A reasonable fact finder could infer that N.G.'s testimony did not contradict her statement but was merely inconclusive or reflected a lack of memory from the passage of time.

¶ 34     Second, and more important, even if the jury had to interpret N.G.'s testimony as a positive assertion that defendant did not kiss her on the mouth, this would merely create a conflict in the evidence that the jury could resolve in favor of the prosecution. The jury would be well within its prerogative in doing so, especially given that N.G. made the statement less than two weeks after the encounter with defendant but testified more than three years after the event. See *People v. Lara*, 2011 IL App (4th) 080983-B, ¶ 42.

¶ 35     In *Lara*, the child victim's video-recorded statement alleged that the defendant licked her " 'pee pee.' " *Id.* ¶ 24. However, at trial, the victim was asked whether the defendant had " 'touched' " her with a part of his body other than his hand, to which she answered, " 'no.' " *Id.* ¶ 40. The court held that "the jury could have found [the victim's] video-taped statement more complete and trustworthy than her trial testimony, given its proximity in time to the incident" (the statement was given approximately five months before trial). *Id.* ¶ 42. The court noted that the jury had the prerogative to decide the credibility of the witnesses, assess the weight to give their testimony, and draw reasonable inferences from the evidence. *Id.* ¶ 41.

¶ 36     Here, the inconsistencies, if any, between N.G.'s video-recorded statement and her trial testimony did not automatically create a reasonable doubt. Instead, her statement and testimony were factors for the jury to consider—along with other relevant matters—in assessing her credibility and the weight to give her testimony. Defendant was free to argue these inconsistencies

to the jury, as he did, and the jury was free to rely on N.G.'s video-recorded statement in considering all of the evidence. Holding that these discrepancies barred a finding of guilt beyond a reasonable doubt would require us to substitute our judgment for that of the jury on a question involving the credibility of a witness and the assessment of conflicting evidence. We decline to do so. Rather, we hold that the evidence was sufficient for the jury to find defendant guilty beyond a reasonable doubt on count IV.

¶ 37                                   III. CONCLUSION

¶ 38     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 39     Affirmed.